**Cedric ARMSTRONG, Appellant,**

v.

**Rosa ARMSTRONG, Appellee.**

No. 2001/120.

District Court, Virgin Islands,
Appellate Division,
D. St. Croix.

June 26, 2003.

Martial A. Webster, Sr., Esq. St. Croix, U.S.V.I., for Appellant.

Lisa Harris–Moorhead, Esq., St. Croix, U.S.V.I., for Appellee.

Before: FINCH, Chief Judge, District Court of the Virgin Islands; MOORE, Judge of the District Court of the Virgin Islands; and IVE A. SWAN, Judge of the Territorial Court, Sitting by Designation

## MEMORANDUM OPINION

PER CURIAM.

This appeal is from an order of the Territorial Court granting alimony in gross and child support, and distributing what it termed the "marital homestead" in favor of the appellee. The following issues are presented on appeal:

1. Whether the trial court erred in finding that appellant engaged in an extramarital affair, resulting in the breakdown of the marriage;

2. Whether the trial court abused its discretion in finding that real property, which was partly owned by a third party, was the couple's marital homestead subject to distribution;

3. Whether, in assessing alimony, the trial court erred in failing to consider real property owned and purchased by appellee during the marriage and in failing to consider appellant's ability to pay;

4. Whether the trial court erred in making an award of child support without assessing appellant's finan-

cial ability to pay; in setting the amount without reference to the child support guidelines; and in setting an amount without determining each parent's proportionate share.

For the reasons stated herein, this Court determines that the trial court's characterization of No. 35 Estate Prosperity as the "marital homestead" was error and will, accordingly, reverse the court's distribution of that property to the appellee. Additionally, because the Territorial Court relied on facts which were clearly erroneous, failed to consider and apply appropriate factors for its alimony and child support awards, and failed to adhere to the mandatory statutory procedures in determining an appropriate child support award, its decision in that regard will be vacated and remanded for further consideration and findings consistent with this opinion.

## I. FACTS AND PROCEDURAL POSTURE

Sometime in 1983 or 1984, Cedric Armstrong ("Cedric" or "Appellant") contracted to buy property at No. 35 Estate Prosperity for $11,000. He had recently completed high school and was unemployed at the time. [Joint Appendix ("J.A.") at 37,134,390–91]. Therefore, his mother, Irenia Armstrong ("Mrs. Armstrong") withdrew approximately $6,000 or $7,000 from a savings account she held for him from accumulated childhood gifts. [J.A. at 132–33,390–91]. Mrs. Armstrong paid the deficiency in the sale price from her personal savings and hired a contractor to commence construction of a home. [J.A. at 133]. It is undisputed that Mrs. Armstrong substantially completed the home—building up to the beams for the roof—with her personal funds. [J.A. at

134, 393]. Thereafter, Cedric secured a job and took over the responsibility for finishing the house, which he did after securing a loan of $30,000. [J.A. at 134, 389–91]. The home, consisting of a three bedroom, two bath upper level, was completed and furnished in early 1987, and Cedric moved in. [J.A. at 216]. The planned lower level apartment was only partially completed. [J.A. at 28,224]. Cedric and his mother held title to the property as joint tenants. [J.A. at 393].

In 1986, Cedric met Rosa Armstrong ("Rosa" or "Appellee"). The two were married in May 1987, and Rosa subsequently moved into the Prosperity home. From that marriage, they have two living children; a third child died in infancy. Cedric's son from a prior relationship—who was two years old at the time of the marriage—also resided with the couple. [J.A. at 84, 393].

At the time of their marriage, Rosa earned approximately $19,000 from the V.I. Housing Authority. [J.A. at 47–48]. Her salary has increased to approximately $23,000 annually. [J.A. at 213–14]. Rosa also collected rent monthly for her own use from three rental units in Puerto Rico, which she has managed since her father's death. [J.A. at 325–26]. The parties dispute the amounts of those rents—Cedric pegs the amount at $800 monthly; Rosa said the rents now amount to only $150. [J.A. at 142–43; 325–36]. Appellant initially derived his income of approximately $21,750 from a Government job, which was supplemented by the approximately $100–275 he earned weekly from the family-owned business, Armstrong's Homemade Ice Cream.[1] [J.A. at 47–48; Appellant's Dep. at 9]. Appellant left his government job in 1990 to assume greater responsibili-

---

1. Rosa is also claiming an equitable interest in that business. However, the trial court did not address that claim, correctly noting that it must be heard in a separate civil action.

ty for the family business after his father became ill, although his mother retained control of the business. From that point, it becomes difficult to determine his income with any certainty. He previously had no set salary from the business, and his earnings varied depending on net profit amounts. There was considerable testimony at trial regarding his personal and business income, and various tax returns were admitted into evidence. Appellant also testified he now earns a set salary of $240/weekly from the business, as set by the officers of the corporation.[2] [J.A. at 61–68, 103–65, 419–44]. However, he also testified that he often gets additional money from the business when necessary to defray his personal expenses. [*Id.*]. In response to attempts to determine the amount of any additional benefit from the business, Cedric said the only way to determine that amount would be to compare his expenses with gross earnings. [J.A. at 160–65]. Thus, the actual personal salary paid directly to Cedric is not readily ascertainable, although there is certainly sufficient information on the record to derive an estimate of his personal income or net funds available for his personal use.

Rosa testified that, for the duration of the marriage and for some time after this divorce action commenced, Cedric assumed full financial responsibility for the family. He paid the mortgage of approximately $1,200; paid the children's school tuition; paid the car notes—over $600 for a Ford Explorer she drove and $489 for a truck he drove;[3] paid for their family vacations and all other needs of the family. [J.A. at 264–297; 327, 342]. He additionally gave her at least $300 weekly from the business, though she testified he often gave her more money as needed. [J.A. at 241–43].

Following Hurricane Hugo in 1989, Cedric paid off the existing mortgage on the Prosperity property with approximately $20,000 in insurance proceeds. [J.A. at 39,232]. In 1999, the efficiency apartment was completed. [J.A. at 37–39].

Rosa acknowledges she did not contribute financially to completion of the apartment and, indeed, contributed no finances to the construction of the Prosperity home. [J.A. at 322–27, 342]. Indeed, she acknowledged she "didn't have a dollar" in that home. [*Id.*]. However, she asserts her father contributed windows for the lower apartment and traveled from Puerto Rico to assist with the project, though it was disputed whether he helped for one day, four days or at all. [J.A. at 38–39, 73, 223–29, 366]. That apartment rented at one time for approximately $500, although it was vacant at the time of trial. The Prosperity home has been appraised at approximately $190,000. [J.A. at 323, 42].

The couple lost a child in infancy and received over $49,000 from a medical malpractice settlement, which they divided equally. [J.A. at 234–36]. With those funds, Rosa completed payment for a homesite at No. 406 Barren's Ridge, which she purchased during the marriage. [J.A. at 234–35,142,323–24,348]. Over a period of time, Rosa started construction of a multi-unit apartment building on that property, which is slated to have a lower level unit and an upper level duplex. The lower unit, a two-bedroom home, is complete. She asserted her mother lives there rent-free. That home has an appraised value of approximately $135,000 upon completion. [J.A. at 349]. Rosa holds a deed solely in her name, although she claims

---

**2.** Officers of the corporation consist of Cedric, his mother and sister. Rosa previously held a corporate office but has since been removed.

**3.** Rosa also claimed full ownership of the Explorer purchased by Cedric for her use and equitable interest in the truck. The court awarded her the Explorer.

her mother has interest in the property. [J.A. at 185,234,322–24]. From his share of the settlement, Cedric contributed to the purchase of property in Estate Whim for relocation of the Armstrong family ice cream business.

In 1995,Cedric sought to mortgage the Prosperity home to finance construction and relocation of the family business, but was required by the mortgage company to join Rosa on the loan. [J.A. at 71–72]. He did so, and he and Rosa signed as the sole obligors of the loan. [J.A. at 41–45]. Additionally, a deed was executed, from Cedric and Mrs. Armstrong, naming themselves and Rosa as joint tenants. It is undisputed from the testimony of Rosa, Cedric and Mrs. Armstrong that this transaction was solely for the purpose of satisfying the mortgage company and qualifying for the loan. [J.A. at 69, 236–37, 322;Appellant's Dep. at 57–59; Appellee's Br. at 12]. Rosa additionally testified, consistent with Cedric's testimony, that at all times she understood that mortgage to be for the sole benefit of the business and that she would not be responsible for that debt. [J.A. at 236–38]. Indeed, she even submitted as evidence a writing dated August 25, 1996, which she created, attesting to Cedric's sole responsibility for—and her lack of contribution to—the mortgage. [J.A. at 239].

The couple separated in September 1998; however, the reason for the breakup is the subject of much dispute. Cedric said the marriage ended because of lack of intimacy and Rosa's mistreatment of his son from a previous relationship, as well as her lack of support with the business. [J.A. at 88–93; Appellant's Dep. at 34–38]. Rosa initially asserted "lack of communication" as the prime cause of the breakup, [J.A. at 336; Appellee's Dep. at 58–59], but additionally claimed Cedric was having an extramarital affair which came to light after the breakup. [J.A. at 350; Appellee's Dep. at 47]. Rosa's conclusion that Cedric was having an affair was based, in part, on the fact that he sometimes failed to come home at night.[4] [J.A. at 296–97, 337–40]. Rosa further pointed to an infection she developed in August 1998—just weeks before the breakup—as evidence of an extramarital affair. [J.A. at 296–97]. She conceded, however, that her physician never specified the type of infection. [J.A. at 332–34]. In support of her allegations of an affair, Rosa also said that, following their breakup, she heard rumors from one of Cedric's employees that he was having an affair with another employee; she says she had also seen Cedric driving with that employee. [J.A. at 301, 336]. Cedric denied having an affair and indicated Rosa accused him of doing so only several months after their relationship ended. [J.A. at 103, Appellant's Dep. at 63, 34–38].

Following hearings on the matter, the divorce court determined that the mortgage executed by both spouses had severed the joint tenancy with Mrs. Armstrong, creating a tenancy in common. That court undertook to distribute Cedric's interest in the Prosperity home to Rosa and permitted her to continue to occupy the home and to collect any rents for her

---

**4.** However, Rosa also testified that Cedric was often required to be at the store for long hours, starting often at 1:30 in the morning, to begin preparation of the ice cream. The long hours which the business required led her to encourage him to install a shower in the store. [J.A. at 236, 301–02]. She also testified that on those occasions when he remained at the store through the night, she was able to contact him there by phone. [J.A. at 339–40]. She also noted her husband would become upset if she didn't call the store when he remained there during the night. [*Id.* at 340].

own benefit. [J.A. at 23]. Despite that distribution, the court claimed to leave Mrs. Armstrong's interests in the property unaffected. The court also ordered Rosa to assume responsibility for the mortgage for that home, which had previously been paid solely by Cedric. The court additionally ordered Cedric to pay over $10,000 as alimony in gross—which it indicated was a one-half contribution toward the arrearage on the Prosperity mortgage—and additionally ordered him to pay child support of $800 monthly, plus additional amounts to cover the private school tuition of one of the couple's minor children and "summer camps and any other educational related expense." [J.A. at 26].

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This being an appeal from a final judgment in a civil case, this Court has appellate jurisdiction pursuant to title 4, section 33 of the Virgin Islands Code.

■ The trial court has broad discretion to distribute marital assets in a divorce, and this court reviews such decisions for abuse of that discretion. *See, Feddersen v. Feddersen,* 68 F.Supp.2d 585 (D.V.I.1999). Factual determinations may be reversed on appeal only for clear error, while the court's application of law is subject to plenary review. *See, Bloch v. Bloch,* 473 F.2d 1067,1068–69(3d Cir.1973). Where testimony differs and credibility becomes an issue, due regard must be given to the trial court's opportunity to view the demeanor of the witnesses and weigh credibility. *See, United States v. Delerme,* 457 F.2d 156, 160 (3d Cir.1972); *Durham Life Ins. Co v. Evans,* 166 F.3d 139, 147(3d Cir.1999); 4 V.I.C. § 33.

### B. The Court Relied on Clear Error of Fact in Finding That the Appellant Engaged in an Extramarital Affair Which Substantially Caused the Breakdown of the Marriage.

■ Appellant does not challenge the court's determination that fault is a proper consideration in the distribution of the marital homestead, *see, Allen v. Allen,* 118 F.Supp.2d 653, 657 (D.V.I.2000);*Charles v. Charles,* 788 F.2d 960 (3d Cir.1986), but challenges the court's factual findings that an extramarital affair caused the breakdown of the marriage.

Both parties disputed the point at which their marriage began to deteriorate and the ultimate cause of the breakup. Rosa cited several reasons for the breakup. Although indicating lack of communication was the prime cause, she also later indicated the breakup resulted from Cedric's marital misconduct. In support of this assertion, she pointed to a feminine infection she suffered just weeks before the breakup; the fact that he often spent nights at his business; and her belief—largely formed after the breakup—that he was involved in an affair with an employee. Cedric refuted those assertions and claimed Rosa's lack of intimacy and mistreatment of his son gradually deteriorated their marriage. He further testified that Rosa did not accuse him of having an extramarital affair until three months after the couple separated. [J.A. at 103]. Based on this testimony, the trial court found:

> Respondent conceded that he did not always uphold his vow of fidelity, but claimed that Petitioner's alienation of affection contributed to his actions.

[Court's Mem. Op. & Order, at 6–7 (June 5, 2001) ]. Relying on its finding that Cedric had conceded to having an affair, coupled with Rosa's medical documents attesting to the fact that she had suffered from

an unspecified feminine infection,[5] the Court concluded that Cedric was at fault for the breakup of the marriage, warranting balancing the equities in Rosa's favor. The court's finding that Cedric had admitted to an affair, which formed the basis for its findings regarding fault, was unsupported by any evidence in the record and, indeed, is contrary to Cedric's persistent denial of such conduct both in deposition and trial testimony. Because it is impossible to determine the extent to which this erroneous finding influenced the trial court's decision, we will remand for further findings on this issue.

### C. The Trial Court Erred in Distributing the Prosperity Home as Marital Homestead.

■ Appellant argues that, in distributing the Prosperity home in favor of Rosa, the Court failed to consider his and Mrs. Armstrong's primary contribution to the development of the home prior to his marriage to Rosa and also improperly affected the property interests of the third-party joint tenant.[6]

■ The court's authority to distribute property in a divorce action is limited to two types of marital property: personal property acquired during the marriage and only that real property utilized as the marital homestead. *See, Todman v. Todman,* 571 F.2d 149, 150 (3d Cir.1978); *Feddersen,* 68 F.Supp.2d at 595;*see, also, Fuentes v. Fuentes,* 38 V.I. 29 (Terr.Ct.1997). Any other real property owned by the parties may be divided only in a separate civil action. *See, Fuentes,* 38 V.I. 29. The Virgin Islands Code defines a "marital homestead" as "the abode including land and buildings, owned by, and actually occupied by, a person, or by members of his family free of rental charges." VIRGIN ISLANDS CODE ANN. tit. 33, § 2305(a)(1994). In this instance, the court's findings supporting its distribution of the Prosperity home were clearly erroneous in several respects, warranting reversal.

■ Significantly, the Prosperity home was held in joint tenancy by the parties and a third person who is not a party to the divorce action. Such a joint tenancy creates an *undivided* interest in the whole property by Cedric, Rosa, and Mrs. Armstrong jointly, with each tenant possessing equal rights in the enjoyment of the property during their lifetime and having the right of survivorship. *See, e.g., In re Estate of Phillip,* 1999 WL 314207, *2(Terr.V.I.1999) (citing 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 3(2d ed.1995); *Herring v. Carroll,* 171 W.Va. 516, 300 S.E.2d 629, 631 (1983); *Krause v. Crossley,* 202 Neb. 806, 277 N.W.2d 242, 245 (1979); 7 Richard R. Powell, *Powell on Real Property,* ch. 51–11 at ¶ 617[3] (Patrick J. Rohan former rev. ed., 1998)). Joint tenants together possess the entire estate, rather than a fractional share, and those interests are divided into individual fractional shares only upon severance of the joint tenancy, through an action for

---

5. Although Rosa, in filings before this court, characterizes her feminine problem as a sexually transmitted disease, medical records admitted at trial do not identify the type or likely source of the infection. On questioning at trial, Rosa noted the treating physician never identified the type of infection. The physician, however, asked her if her husband had been having an affair and instructed her not to engage in sex while taking the prescribed medication.

6. Rosa argues the homestead issue is not properly before this Court because, she asserts, the Appellant failed to raise that issue below in the first instance. This Court can readily dispense with that argument, because it is evident from the record that appellant raised that issue at trial. [J.A. at 289–93].

partition or conveyance to a third party. *See, United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414,1421, 152 L.Ed.2d 437 (2002).

 Because the conveyance of one tenant's ownership interests severs the joint tenancy, the effect of a mortgage on the continued existence of the joint tenancy depends on whether a mortgage effects a lien on the property or passes title. Under the title theory, a mortgage conveys title to the property in fee to the mortgagee, so that a mortgage severs the original joint tenancy and creates a tenancy in common with the mortgagee; the lien theory recognizes a mortgage as a mere security interest, which conveys no right to possession and which has no effect on the joint tenancy. *See, e.g. Royal Bank of Canada v. Clarke,* 373 F.Supp. 599, 601 (D.Vi.1974); RESTATEMENT (THIRD) OF PROPERTY *(Mortgages)* § 4.1, comment a(1997). The trial court correctly considered these distinctions, but purported to "subscribe to the title theory" approach, in contravention of local law designating the Virgin Islands as a lien theory jurisdiction. *See,* 28 V.I.C. § 290 (a mortgage does not effect a conveyance); *Royal Bank,* 373 F.Supp. at 601. Having erroneously concluded the Virgin Islands is a title theory jurisdiction, the court therefore reasoned that the mortgage executed by Rosa and Cedric severed the joint tenancy, resulting in a tenancy in common between both spouses and Mrs. Armstrong. Following that reasoning, the court then distributed a two-thirds interest in the property to Rosa(her purported one-third interest and Cedric's one-third interest), coupled with the right to possession and to collect all rents, leaving the remaining one-third interest to Mrs. Armstrong. While purporting to

leave Mrs. Armstrong's interest unaffected, the court nonetheless awarded Rosa exclusive possession of the property and the right to collect all rents from the apartment, effectively depriving Mrs. Armstrong of the right to possession and use of the property and its income. *See, Craft,* 122 S.Ct. at 1421; *compare, Nelson v. Albrechtson,* 93 Wis.2d 552, 287 N.W.2d 811 (1980); 26 C.J.S. *Deeds* § 68, at 791 (1956). This distribution scheme cannot stand, because it rests on a misapplication of the law of this jurisdiction and is, therefore, clearly erroneous.

Given the continued existence of the joint tenancy with Mrs. Armstrong, the Family Court was without authority to distribute the home as the marital homestead. The home was owned, not by either spouse, but jointly with Mrs. Armstrong—over whom the Family Court had no jurisdiction and whose property interests could not be properly affected by that court. Thus, the nature of the shared ownership interests with a third party precluded distribution as the "marital homestead", as defined in the statute. Rather, any distribution of that property must be done in a separate civil action for partition, after consideration of each party's equitable interest.[7] *See,* 28 V.I.C. § 451, *et seq.* (1962); *Compare, Dyndul v. Dyndul,* 541 F.2d 132, 134–35(3d Cir.1976); *In re Marriage of Voight,* 111 Ill.App.3d 623, 67 Ill. Dec. 458, 444 N.E.2d 694 (1982)(superseded by statute, *see, In re Marriage of Eckert,* 559 N.E.2d 1090 (Ill.1990)). Therefore, to the extent the court relied on an incorrect application of the law and clear errors of fact in determin ing the nature of the tenancy and each party's ownership interests, and in further characterizing the

**7.** Each tenant's equitable interests in the property can be more fully considered in an action for partition, where effect may be given to each party's contributions and efforts in developing and maintaining the property. *See,* 28 V.I.C. § 451.

property as the "marital homestead," its decision in that regard must be reversed.

Even if this Court could determine that distribution of joint tenancy property in this divorce action was proper, there exist alternative bases for reversal, which we feel compelled to point out in keeping with our appellate role.

First, in addition to its erroneous finding that Cedric had admitted to fault, the court additionally erred in concluding the home was subject to distribution in favor of Rosa, without regard to the other factors recognized in this jurisdiction. As earlier noted, a spouse's marital misconduct leading to the breakup of the marriage is but one factor in determining the distribution of the marital homestead, in recognition of the view that the culpable spouse "should not expect to receive a financial kudo for his or her misconduct." *Charles,* 788 F.2d at 960. However, the court's analysis must not end there, but must also include a consideration of the circumstances of each spouse in arriving at a division that would be fair and equitable. *See, Fuentes, supra.* The following factors must form the basis of that inquiry:

> . . . the duration of the marriage, prior marriage of either party, antenuptial agreement of the parties, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to maintenance, and the *opportunity of each for future acquisition of capital assets and income.* The

court shall also consider the contribution or dissipation of each party in the acquisition, preservation, depreciation, or appreciation in value .of the . . . estate[ ], and the contribution of a spouse as a homemaker or to the family unit.

*Allen,* 118 F.Supp.2d at 658 (quoting UNIF. MARRIAGE AND DIVORCE ACT § 307, 9A U.L.A. 288 (1998)); *see also, Charles v. Charles,* 788 F.2d 960, 967 (3d Cir.1986) (noting that equity may also require consideration of "the extent to which the spouses have brought income and property to the marriage"). Consideration of each party's contribution to the acquisition of the property necessarily requires the court to delve beyond the form of ownership and title and inquire into the specific facts and circumstances of the parties' marriage and the circumstances under which the property was acquired. *See, e.g., Lamb v. Lamb,* 1994 WL 614995, *1 (Minn.App.1994) (reversing lower court's finding that property held by spouses in joint tenancy was marital property, noting that "merely transferring title from individual ownership to joint tenancy does not transform non-marital property into marital property.") (quoting *Montgomery v. Montgomery,* 358 N.W.2d 169, 172 (Minn. App.1984)). Therefore, notwithstanding the existence of a joint tenancy created in favor of Rosa to Cedric's separate property acquired prior to the marriage, the trial court should have initially determined whether the property was subject to distribution[8] and then weighed the equitable considerations noted above in arriving at a fair distribution. Such a factual inquiry is

---

8. Although the joint tenancy created in favor of Rosa may create a presumption of a gift to the marital estate, that presumption is rebuttable by clear and convincing evidence that there was no donative intent to unconditionally gift that property to Rosa or to the marital estate. *See,* RESTATEMENT (SECOND) OF PROPERTY § 31.1 (1992) (discussing rule regarding gifts of personal property, which has been applied

to gifts of real property), *see also,* RESTATEMENT (THIRD) OF PROPERTY § 6.1(a),comment b(2003) (gifts of real property);41 C.J.S. *Husband & Wife* § 105 (2002); *compare, In re Marriage of Marriott,* 264 Ill.App.3d 23, 201 Ill.Dec. 709, 636 N.E.2d 1141, 1147–1152 (1994) (to establish that spouse intended the joint tenancy conveyance to pass interest in previously held separate property to the other spouse or to

consistent with local law, which protects property acquired prior to the marriage as "separate property," and with the well-settled recognition that only property acquired during the term of the marriage, and *through the joint efforts of both parties,* is subject to distribution upon divorce. *See, e.g.,* 16 V.I.C. § 67 (defining "separate property"); 16 V.I.C. § 109(4); 33 V.I.C. § 2305(d). Notably absent from the court's findings here, however, is a consideration of factors set forth in *Charles* and *Feddersen,* or a threshold determination that the Prosperity property constituted marital property as earlier defined.[9]

In weighing the equities in Rosa's favor, the Court further relied on erroneous factual findings that Rosa had contributed $7,230 from a personal loan to the Appellant's business and constructed a cistern on the Prosperity property. Those findings are wholly unsupported by the facts in the record. While Rosa testified, in describing the source of funds for the construction on her home in Estate Barren's Ridge, that she had obtained such a loan, the record reflects no testimony that the loan was made for the benefit of her husband, the Prosperity home, or for the business. The Court's finding regarding her contribution to construction of the Prosperity home is also inconsistent with the

undisputed testimony of all witnesses that the Prosperity home was built prior to the marriage and solely from the resources of Cedric and Mrs. Armstrong.

Finally, in balancing the equities, the Court appeared to consider only the Prosperity property and other property held by Cedric, but made no findings regarding the status and effect of other property held by Rosa, to include: the home at No. 406 Barrens Ridge, which was acquired and constructed during the marriage and which could arguably constitute marital property; Rosa's monthly rental income from properties in Puerto Rico; her potential rental income from the Barren's Ridge property; and any other personal property held by both parties. Nor did the court appear to consider the undisputed testimony that Rosa had made no financial contributions to the Prosperity home, either before or during the marriage.

■■■ It is well-settled that an appellate court may not substitute its factual findings for that of the trial court, but must accept the ultimate factual determination of the fact finder unless those findings are shown to be clearly erroneous. *See, Bloch v. Bloch,* 473 F.2d 1067, 1068–69(3d Cir. 1973). Such clear error is shown where the trial court's determination is either

---

convert separate property to marital property, donative intent—an essential element of a gift—must be shown); *In re Marriage of Nicks,* 177 Ill.App.3d 76, 126 Ill.Dec. 442, 531 N.E.2d 1069 (1988); *Husband R.T.G. v. Wife G.K.G.,* 410 A.2d 155, 160 (Del.1979) (rebuttable presumption created where spouse transfers real property to non-owning spouse);*compare, Berry v. Breslain,* 352 N.W.2d 516, 518 (Minn.App.1984) (rejecting argument that a spouse's home owned prior to the marriage was transmuted to marital property by the later creation of a joint tenancy with other spouse, which was done for the sole purpose of securing a mortgage, as required by the lender); *Larman v. Larman,* 991 P.2d 536, 541–42 (Okla.1999) (noting that the presumption of a gift to the marital estate is overcome

where bank required wife to join spouse on the deed as a condition precedent to securing a mortgage on the property, because of the absence of donative intent; there is no donative intent, without more, where the transfer was done merely because spouse is unable to qualify for a loan without joining the non-owning spouse on the deed).

9. *But, see, Knowles v. Knowles,* 354 F.Supp. 239, 244 (D.V.I.1973) (distributing to wife interests in the homestead owned solely by husband, where wife was led to believe that the property was jointly owned and where the equities of the case demanded that result to prevent injustice to wife, *who had contributed to the purchase and repair of the home* ).

"completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Id.* The trial court's findings are clearly erroneous under the standard set forth in *Bloch* and potentially shifted the weight of equity in Rosa's favor.

**D. The Trial Court Erred in Failing to Articulate Findings Supporting Its Alimony Award.**

 The divorce court has jurisdiction to award alimony in a divorce pursuant to title 16, section 109(3) of the Code, which provides:

> Whenever a marriage is declared void or dissolved the court may, without regard to any determination that the breakdown of the marriage was the fault of one party or the other, further decree:
>
> (3) for the recovery for a party determined to be in need thereof an amount of money in gross or in installments, as may be necessary for the support and maintenance of such party;

16 V.I.C. § 109(3). This jurisdiction has made clear that an alimony award must be based on:

> ...the amount of property of each spouse, the circumstances surrounding the parties, the wife's necessities, and the husband's financial ability, the physical condition of the parties, the nature of their life together, and in these modern times the wife's independence and ability to earn her own way, which must all be considered by the court in the exercise of its discretion in awarding or denying alimony.

*Feddersen,* 68 F.Supp.2d at 595;*see, also, Morris v. Morris,* 20 V.I. 249

(Terr.Ct.1984). Issues which factor into the court's consideration in that regard include: an assessment of the husband's personal income; the needs of the ex-wife; the husband's ability to pay for those needs; checking account balances; the wife's employment and financial ability; living expenses, and outstanding debts and obligations. *See, Hamilton v. Hamilton,* 1996 WL 941959, *3 (Terr.V.I.1996) (citing *Viles v. Viles,* 250 F.Supp. 211 (D.Vi. 1966)). Like the distribution of marital property, the court's alimony award is also reviewed for abuse of discretion. *See, Feddersen, supra* at 590.

 In this instance, the court denied the appellee's request for permanent alimony, but awarded over $10,000 as rehabilitative alimony, to assist Appellee in meeting the arrearage on the mortgage.[10] The court noted that, in making this determination, it considered the appellee's contributions to the appellant's business, the fact that appellee had "mortgaged her home, and even obtained a personal loan all for the benefit of the Respondent's family's ice-cream business"[11] and the appellee's need for a large sum of money to forestall the foreclosure action. Missing from the court's determination or findings, however, was any consideration of the appellant's ability to pay or of the appellee's assets beyond her regular income. This issue is remanded for additional findings.

**E. The Trial Court Erred In Failing to Make Findings and in Failing to Set Child Support According to Statute.**

 The standard for setting child support is statutorily defined. Title 16,

---

10. The court awarded the home to the appellee, with the concomitant responsibility for the mortgage. At the time of the court's order, over $20,000 was due on the mortgage, and a foreclosure action had commenced.

11. As noted earlier, this finding is also unsupported by the record.

section 345 of the Virgin Islands Code makes clear that child support should be established so as to require each parent to share in the support of their child or children, based on their respective financial stations. *See,* 16 V.I.C. § 345(c). In setting those amounts, the statute mandates adherence to the statutory guidelines and provides, in pertinent part:

> (b) In any proceeding to establish or modify a child support obligation, whether before the Court, or before the hearing officer pursuant to section 354 of this chapter, *the child support guidelines established pursuant to subsection (c) of this section shall apply. The guidelines shall create a rebuttable presumption that the amount resulting from the application thereof is the correct amount of child support to be awarded.* Application of the guidelines shall extend to proceedings setting child support amounts pursuant to agreement, stipulation or consent.

16 V.I.C. § 345(b)(emphasis added). While the statute permits a departure from the child support guidelines when justice so requires, any such departure must be done only under limited circumstances and must be supported by findings of fact. In that regard, the statute provides:

> The guidelines may be modified or disregarded if it is determined that injustice would result from the application thereof. Such determination must be based on criteria taking into consideration the best interests of the child (children), *and further must be supported by specific and written findings of fact, including, at a minimum, the amount that would have been established by the guidelines and the reasons for the variance therefrom.*

16 V.I.C. § 345(c)(emphasis added); *see, also, Government of the V.I. v. Anthony,*

29 V.I. 201 (D.V.I.1994). Given this clear statutory mandate, the trial court erred in setting the child support amount at $800 for the two minor children, plus an additional sum for private school tuition for one child, without adhering to the child support guidelines or without making findings on the record supporting the amounts imposed.

## III. CONCLUSION

For the foregoing reasons, the trial court's distribution of the home at No. 35 Estate Prosperity as the couple's "marital homestead" will be reversed. The trial court's alimony and child support awards are also vacated and remanded to the lower court for further consideration consistent with this opinion. An appropriate order follows.

### ORDER

For the reasons stated in an accompanying Memorandum Opinion of even date, it is hereby

**ORDERED** that the trial court's distribution of the home at No. 35 Estate Prosperity as the couple's "marital homestead" is **REVERSED.** It is further

**ORDERED** that the court's awards of alimony and child support are **VACATED** and **REMANDED** for further consideration consistent with this Court's opinion.